# SUPREME COURT OF TENNESSEE

FOR THE

## MIDDLE DIVISION.

NASHVILLE, DECEMBER TERM, 1914.

(*Continued from Vol.* 131.)

TENNESSEE CENTRAL RAILROAD COMPANY *v.* MRS. ARTIE
MORGAN.

TENNESSEE CENTRAL RAILROAD COMPANY *v.* CARL
MORGAN.

TENNESSEE CENTRAL RAILROAD COMPANY *v.* CLAUDE
MORGAN.

(*Nashville.* December Term, 1914.)

1. **TRIAL.** Direction of Verdict. Evidence.

In passing on a motion for a peremptory instruction, the court
must take the most favorable view of the evidence appearing
from the record, supporting the rights asserted by the party
against whom the motion is made. (*Post, p.* 4.)

---

* Reporter's Note: The opinion in these cases was sent to the
West Publishing Company on April 25, 1915, and appeared in Ad-
vance Sheets of May 26, 1915, at page 1148, but was withdrawn for
correction, and therefore, was not published in 131 Tennessee, but
is published now, as corrected, in this volume.

Railroad v. Morgan.

Case cited and distinguished: Tyrus v. Railroad, 114 Tenn., 579-594.

2. TRIAL. Taking case from jury. Question of law or fact. Conflicting evidence.

There can be no constitutional exercise of the power to direct a verdict in any case where there is a dispute as to any material evidence or any legal doubt as to the conclusion to be drawn from the whole evidence upon the issues to be tried, but the case must go to the jury; but, if there is no such dispute, the question is one of law for the court. (*Post, p.* 12.)

Case cited and approved: Railroad v. Scott, 87 Tenn., 494.

Case cited and distinguished: Railway v. Haynes, 112 Tenn., 712.

3. RAILROADS. Accident at crossing. Question for jury.

In an action for the death of the husband of one of the plaintiffs and for personal injuries to the other plaintiffs, when their buggy was struck by defendant's engine, *held*, on the evidence, that whether defendant's trainmen were negligent in not keeping a lookout, and whether the engineer, after plaintiffs' peril had been discovered, took the right precautions against injury, were for the jury. (*Post, p.* 17.)

4. RAILROADS. Accident at crossing. Instructions. Negligence.

"An instruction that the situation of the locality as to obscuring the view of plaintiffs in the buggy or the trainmen on the engine, not caused by the default of either, was not the basis for a recovery or for liability, but that such situation and the rate of speed and the nearness of the engine to a train ahead of it were all to be considered in determining whether the statutory requirements had been complied with, and, if not, whether such failure was due to plaintiffs' sudden appearance on the track, so that defendant's servants had no time to comply therewith, was proper. (*Post, p.* 17.)

5. RAILROADS. Accident at crossing. Instructions. Contributory negligence.

An instruction that it was the duty of one crossing a railroad track to be mindful of trains and to look and listen, and, if

Railroad v. Morgan.

necessary, stop, and to exercise that care and caution which a reasonably prudent person would exercise, under similar circumstances, to protect himself, was proper. (*Post, p.* 17.)

6. TRIAL. Instructions. Emphasizing particular facts.

Where the defendant's requests were so worded that they might have caused the jury to overlook its duty as to so sounding the whistle, if that could be done, the qualification of such instructions, so as to prevent the jury from overlooking such duty, if, under the circumstances, that was the best thing to do, and if the engineer had time to do so, was not objectionable as putting an undue emphasis on that feature of the case. (*Post, p.* 17.)

7. TRIAL. Infringement of jury trial. Withdrawal of evidence from jury. "Will." "Must." "Shall."

Where the jury believe that a witness has sworn falsely and corruptly in one material respect, they may disregard the evidence altogether, except in so far as it is corroborated by other credible evidence; but an instruction that "you 'will' reject his testimony altogether" was equivalent to "shall" or "must" and erroneous as withdrawing from the jury all the evidence which they might deem of the character indicated and denying the parties the constitutional right of trial by jury. (*Post, p.* 19.)

8. APPEAL AND ERROR. Harmless error. Instructions.

Such error was not harmless, within chapter 32 of the Acts of 1911, providing that no verdict shall be set aside or new trial granted for error in the charge or any error, unless it affirmatively appears that it has affected the result of the trial. (*Post, p.* 19.)

9. APPEAL AND ERROR. Assignment. Fundamental error.

Error, in an instruction as to the credibility of a witness testifying falsely in one material particular, equivalent to a withdrawal of evidence of such character, and to a deprivation of the constitutional right of trial by jury, *held* to make it the duty of the supreme court to consider it as if it had been properly assigned. (*Post, p.* 19.)

10. **WITNESSES. Impeachment.**
> In action for the death of plaintiff's husband and for injury to other plaintiffs from being struck by defendant's engine, where a witness for plaintiff testified that the defendant's fireman was a man of bad character when he lived in witness' neighborhood twelve or thirteen years before the trial, a letter written by the witness certifying that the fireman had been a quiet, peaceable boy was admissible to discredit the witness. (*Post, p.* 21.)

FROM WILSON.

Appeal from Circuit Court, Wilson County, to Court of Civil Appeals, and by *certiorari* from Court of Civil Appeals to Supreme Court.—JOHN E. RICH-ARDSON, Judge.

W. S. FAULKNER and W. R. CHAMBERS, for plaintiff.

J. M. ANDERSON, LILLARD THOMPSON and J. H. CAMPBELL, for defendant.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

These cases were brought in the circuit court of Wilson county to recover damages of the Tennessee Central Railroad Company for the alleged wrongful death of William Morgan, the husband of Mrs. Artie Morgan and for injuries inflicted by the engine of the railroad company on Claude Morgan and Carl Morgan. The cases of the two latter were tried together; that of Mrs. Artie Morgan separately. A verdict was rendered in favor of Claude Morgan for $3,000 and of

Carl Morgan for $2,000, but the former verdict was reduced on suggestion of the trial judge, so that judgment was rendered finally in favor of each of the two boys for $2,000. Mrs. Artie Morgan, in her case, obtained a verdict of $12,000, for which judgment was rendered. The cases were appealed to the court of civil appeals, and there all tried together, and a single opinion rendered by that court.

There was made in each of the cases in the trial court a motion for peremptory instructions by the railroad company, and there denied. The company assigned error in the court of civil appeals upon this action of the trial court, and that error was sustained, resulting in the dismissal of all of the cases by the court of civil appeals. All of the cases were then brought to this court by the writ of *certiorari*, and here the Morgans assigned error on the action of the court of civil appeals in sustaining the motion for peremptory instructions. The action of that learned court in so dismissing the suits is the first matter for our consideration.

We are of the opinion that that learned court committed error in dismissing these suits.

Of course, it is true that, in passing on a motion for peremptory instructions, the court must take the most favorable view of the evidence appearing in the record supporting the rights asserted by the party against whom the motion is made. Moreover, as said in *Tyrus* v. *Railroad*, 114 Tenn., 579-594, 86 S. W., 1074, 1077:

"There can be no constitutional exercise of the power to direct a verdict in any case in which there is a dispute as to any material evidence or any legal doubt as to the conclusion to be drawn from the whole evidence, upon the issues to be tried. . . . That is, if there is any dispute as to any material fact, the case must go to the jury; if there is no dispute as to such facts, the question is one of law for the court. If the case is one triable by the jury, the court below may set aside the verdict, on motion for a new trial, if he deem the preponderance of the evidence to be against it. If he refuse to grant a new trial, and the case is brought to this court, and the decision here turns upon the facts, the judgment of the lower court will be permitted to stand, if there is any evidence in the record to support the verdict. If there is no evidence in the record to support the verdict, this court will, upon proper assignment to that effect, reverse the judgment, and remand the cause for a new trial. In the latter aspect of the matter, on motion properly made in the court below for a peremptory instruction, and an improper refusal of it by the trial judge, this court would be enabled to dispose of the case finally, and thereby save to the parties and to the governmental agencies of the State the delay and expense of an additional trial, in the absence of any reversible error in rulings upon evidence or otherwise."

It will be seen, from the recital of facts which we shall presently make, that there is a considerable dispute in the evidence as to material facts, and likewise

Railroad v. Morgan.

that it cannot be said there is no evidence to support the verdict.

On the day the injury occurred, there was a picnic for the employees of the railroad company at Hamilton Springs, a few miles west of Lebanon. A special train, composed of an engine and several coaches, conveyed the picnickers to their destination. There being no siding sufficiently long to hold the cars, the train was, after the passengers left it, run down to Lebanon. There the cars were left, and the engine was propelled back to Horn Springs, a short distance from Hamilton Springs, and there run upon a siding. Late in the afternoon, when it was nearly time to convey the picnic crowd back to their homes, the engineer, fireman, and a flagman, by the name of Blakeley, mounted the engine, ran it out upon the main track, and started eastward toward Lebanon to couple onto the coaches. Just before they had left the siding at Horn Springs, a regular train, known as the "Shopper," passed Horn Springs on its journey from Nashville to Lebanon and other points east of the latter city. When the engine got upon the main line at Horn Springs, the Shopper was just, leaving Hamilton Springs, about a half a mile away. The engine gained upon the Shopper, and was in sight of it when the latter passed the country road where the accident occurred, which was about a half a mile, or such matter, from Hamilton Springs.

We shall now pause for a moment to note the movements of the Morgans. The three of them, William,

Claude, and Carl, were in a buggy, driving along a country road that passed over the track of the railroad company at right angles. The railroad ran east and west; the country road north and south. The Morgans were on the south side of the railroad, and proceeding northward in a slow walk. When they got within thirty or forty feet of the track, they heard the Shopper coming, and stopped. When it passed, they proceeded on their journey. They drove down on the track, the horse had gotten across the rails, and the buggy was in the middle of the track, when the engine from Horn Springs dashed into them, killing William Morgan, and injuring Carl and Claude. The engine was running downgrade in its progress towards the road crossing, and made little noise; the exhaust not working. Having seen the Shopper go by, the Morgans expected no other train, but still, as a matter of caution, William Morgan looked both ways, but evidently saw nothing. He really could see nothing until he was within a few feet (himself, not the horse) of the track, because the country road at that point was in a cut four or five feet deep. On this cut there was a growth of grass, and there was a hedge, making the whole obstruction to vision fully twelve feet high. Moreover, there was a hedge running along the side of the track in the direction from which the engine was coming, and also a cornfield, with the corn some eight or ten feet high. It was therefore impossible for the Morgans to see the engine while they were in the cut, and the cut continued up to within six or eight feet

of the track.  It was equally impossible for any one on the engine to see these parties in the cut, or to see the horse.  The first sight they would get of the horse from the engine would be as his head emerged from the cut into the open space of six or eight feet between the end of the cut and the track.  The Morgans proceeded, as we have already stated, through this cut, and down upon the track, and had assumed the position we have described, the horse across the rails on the north side, and the buggy on the rails, when the engine bore down on them.

We shall now return to the engine and the servants of the company who manned it.  These were the engineer, the fireman, and the flagman Blakeley.  The engine was running backward towards Lebanon.  Blakeley sat on the front end of the tender.  The engineer was at his place, and the fireman at his.  The flagman Blakeley says that he was looking steadily down the track in front; the engineer that he had his back to the boiler, with the lever and other appliances of the engine for controlling its movements, right at his hand, including the cord or rope to pull the whistle, and that he was looking steadily towards Blakeley, the flagman, on the front of the tender, to receive any signal he might make.  The fireman did not testify in Mrs. Morgan's case, but in the other cases he testified that, at the time of the accident, he too, was on the lookout.  Blakeley says that, when the engine had gotten within about forty feet of the mouth of the public road, he saw the ears of Morgan's horse, about forty

feet from the track back in the road or cut, and that he at once gave the appropriate signal to the engineer to put down brakes and stop the engine, which was then running ten miles an hour, but that, before the engine could be stopped, the buggy was in the middle of the track, and the parties were run over.  The fireman testifies in the Claude and Carl Morgan cases that, when he first saw the horse, his head was in the open space referred to, of six or eight feet between the cut and the track, and that then it was Blakeley gave the signal and the engineer put down brakes, and did all he could to stop the engine.  The engineer likewise said that he saw the signal, and acted in the manner just stated, and did everything he could to stop the train and prevent the accident, except that he did not blow the whistle, and he did not have time to do that. So it is perceived, the persons upon the engine testify to the fact that they were alert and watchful, as the engine proceeded along the track towards the place of the accident.  At this point, however, a grave contradiction arises.  Three witnesses for the Morgans testify that, as the engine passed Hamilton Springs, the persons on it were waving their hands toward the picnickers, who lined the track or were scattered down the track a considerable distance along from Hamilton Springs toward the cut.  One of these witnesses testified that the waving continued until he took his eyes from them, and the engine had then reached a culvert west of the public road; but the railroad company's witnesses testify that this culvert was 487 feet

from the road crossing, and that from that point, at least, they were instant in their duty.  However, one of the witnesses for the Morgans testified that he watched them, and that they were still waving when they got very near to the crossing.  The three men on the engine testify that there was no waving done, except by the fireman, and this for only a short distance.  Blakeley admits that he did wave his hand one time at a person who greeted him from the side of the road, but says he did not take his eyes from the track. The engineer does not admit that he waved at all.  So here is an important conflict in the evidence.  If these men were waving their hands, and looking back at the picnickers, as they passed by, they were, of course, guilty of a great breach of duty, since they could not be on the lookout for obstructions.  If they were so waving and looking back, there was ground for the jury to infer that they did not see the obstruction as soon as it could have been seen.

Then, again, there was ground for grave adverse inference on the part of the jury, based on the statement of Blakeley that he saw the horse's ears when he was forty feet back in the cut, and that the horse got on the track before the engine could traverse the same distance, running at ten miles an hour, when the horse was going along slowly, as testified to by Claude Morgan.  There was also ground for grave inference on the part of the jury from the fact that, if Blakeley had been properly watching, he could have seen the horse's head when it got in the open space six or

eight feet from the track, and that the engineer did not then whistle and warn the driver to pull his horse in.

It is to be noted in the Claude and Carl Morgan cases that the fireman testified, as we have already stated, that he saw the horse's head in the open space referred to, and it was then the signal was given to put down brakes, and reverse the engine; but it must be remembered that there was also evidence in those cases that the fireman had stated, in the presence of witnesses at the trial, that if they (meaning himself and the other persons on the engine), had been attending to their business, and had not been looking back and waving, the accident would not have happened, and he was sorry.

Furthermore, we think it most probable that if the engineer had warned the Morgans by whistle, when the horse's head appeared at the track, within striking distance, the accident would never have happened, because his driver, in all probability, would have hastily pulled him back, as he was a gentle horse, and easily managed.

In this connection it is proper to say that it is within the province of the jury to say whether the engineer did the right thing when the occasion arose. It may be if the engine had been running front foremost instead of backwards, and the engineer had himself made choice of signals on seeing the obstruction, he would have blown the whistle, and thus saved the accident; but, as it was, he was dependent on Blakeley, the flagman, sitting on the tender, to look out for him,

and to give him proper signals.   Blakeley chose the signal, and that was to put down brakes and reverse the engine.   If there was not time to do everything the statute requires, the engineer must do the most important thing which the occasion may dictate.   Evidently that most important thing, under the circumstances, was to sound the whistle.   It was so held in the case of *Railroad* v. *Scott*, 87 Tenn., 494, 11 S. W., 317.   We are not to be understood as deciding this point authoritatively at this time.   All we mean to say is that there was evidence from which the jury might have so concluded.   In respect of the inference that may be drawn from the facts occurring at and immediately before an accident, we should now refer to *Railway* v. *Haynes*, 112 Tenn., 712, 81 S. W., 374.   That was a case in which the court had under consideration a street railway accident; but it is to be noted that the common law imposes upon such corporations practically the same duties as our statutes impose upon commercial railways.   It was said on page 726 *et seq.*, of 112 Tenn., on page 377 of 81 S. W.:

"The error complained of is to be found in the following language appearing in the first excerpt above quoted:

" 'Or that he failed, when danger became imminent, to apply the brake and sound the gong or bell, or give other signal, and use every means in his power to stop the car and prevent an accident.'

"It is said that the rule thus laid down would impose upon the motorman the performance of duties

which were practically impossible of accomplishment; that by this rule he is required to sound his gong, give other signal, to apply his brake, and to use every means in his power to stop his car; and that this would make the motorman capable of reversing with one hand, of winding the brake with the other, and at the same time stamping his gong to warn the person who had thrust himself or fallen into danger. We have no statute declaring that the special acts referred to by the circuit judge, or any other special act, should be performed by the servants of the company. The question, then, is one at large, to be determined upon general considerations drawn from the nature of the particular business, and the habits and the customs of the people whom it serves. Street cars are designed to ply their business upon public streets— many of the streets densely crowded. People in vehicles and on foot must be constantly encountered, going in both directions, with the course of the car and in the opposite course, and most generally in the hurry of business. In other words, the car may at any time have to pursue its way through the throng of a city's business. Under such circumstances, and even when the streets are not crowded, a mishap may at any moment occur, and may come in a manner which no man can accurately forecast in all its details. The person propelling the car should be left free to choose the best means of preventing the accident at the time, and as the situation is then presented to him. The means at hand for preventing the collision are the sounding of the

Railroad v. Morgan.

gong for the purpose of warning the person about to be collided with, in order that he may save himself, the putting on of brakes, and the application of the reverse lever. In some situations the sounding of the gong may be the means which the occasion requires as the best means for the prevention of the accident; in others it may be best to apply the brake; in others the reverse lever. Sometimes it may be reasonably within the power of the motorman to put in use two of these means, and sometimes perhaps, all of them; sometimes only one of them; and, under some circum-. stances, we may well assume, it would be best that he should attempt only one of the means provided, as being the most efficient, time lacking to use the others, or even to attempt their use. Subsequently, when his conduct is displayed in the evidence for examination before a court and jury, it is not for the judge to say that, under the circumstances surrounding and attending the accident detailed, he should have done this or that particular thing; but on the contrary, when all of the circumstances are shown, and it is made to appear what he did at the time for the prevention of the accident, it is for the jury to say whether he did all that he could do (that is, all that a man of ordinary intelligence and prudence and of reasonable alertness could have done under the special circumstances proven) to stop the car and prevent the accident. An instruction that the motorman should do some special thing is an invasion of the province of the jury by the circuit judge."

Railroad v. Morgan.

So it is that the jury must judge, under all of the facts proven, whether the engineer did the best that he could do, under the circumstances, to prevent the accident. We think that we have said enough to show that there was at least a reasonable ground for a difference of opinion upon the subject, and that there should have been no peremptory instruction, forbidding the jury to express their opinion on the facts.

We may add that the facts already recited show there was reasonable ground for a difference of opinion as to what the real facts were, arising out of important conflicts in the testimony, and attacks made upon the credibility of one or more witnesses.

The learned court of civil appeals, after holding that the trial judge shold have given peremptory instructions, very properly passed upon other errors assigned in view of the possibility that this court might have a different view as to the propriety of directing a verdict.

The disposition of the matter of peremptory instructions disposes of the first, second, and third assignments made in the court of civil appeals. No question is made here as to the action of the court of civil appeals on the fourth, fifth, and sixth assignments made in that court.

The learned court of civil appeals sustained the seventh assignment made in that court. This assignment complained of the following instruction contained in the charge of the trial judge, viz.:

Railroad v. Morgan.

''The situation of the premises as to obscuring the view of the party in the buggy or those on the locomotive, when not caused by the default of either, is not the basis for recovery, or basis for relief of liability, but such situation, and also the question of rate of speed and proximity of the locomotive to a foregoing train, are all to be considered by you in helping you to determine just what occurred or what did not occur, and helping you to decide the determinative question, which is this: Were the statutory requirements complied with, and, if not, was the failure to comply due to such sudden and immediate appearance upon the road that defendant's agents and servants had not time to comply with them, as I have explained the matter to you?''

We see no objection to this instruction.

The learned court of civil appeals overruled the eighth assignment, and no question is here made of its action in that regard.

That court sustained the ninth assignment. That assignment complained of the following instruction given by the honorable trial judge:

''In order to help you determine whether and to what extent there was any such contributory negligence, I charge you that it is the duty of persons about to cross over railroad tracks to be mindful of the fact that trains do run and pass upon such tracks; and hence it is their duty, generally, to look and listen for an approaching or passing train, and, if necessary, in order that they may be in the use and employment

132Tenn.2

of ordinary care, to stop. Their duty is both to look and listen to the extent of freeing themselves from negligence, and, the less opportunity there is to do one of them, the greater the necessity to do the other. How far he is to go in exercising his faculties of looking and listening is a question for the jury to determine under all of the evidence relating to the situation and condition of the premises, as to obscuring of the view, proximity of the locomotive in question to a foregoing train, or preceding train, and the other facts and circumstances in the case; the rule being this: One must take notice that trains move upon the track, and must exercise such reasonable care and caution, as a reasonably prudent man would employ or use under similar circumstances, to protect him from harm or injury.''

We see no objection to this instruction, and think the learned court of civil appeals was in error in its holding in respect thereto.

The court of civil appeals, after disposing of the assignment just mentioned, passed to assignments numbers 11 and 12, in the case of Mrs. Artie Morgan. These assignments were based upon the action of the trial judge in adding a certain qualification to each of two instructions offered by the railway company and charged by him to the jury. The qualification in each instance was properly designed to prevent the jury from misunderstanding the charges offered to the extent of overlooking the duty of the railway company to sound the whistle, if under all the circumstances, as

Railroad v. Morgan.

they occurred at the time, that was the best thing to do, and if the engineer had time to sound the whistle. We think there was no error in adding this qualification. The requests were so worded, we think, as that they would have resulted, or might have resulted, in causing the jury to overlook the duty as to sounding the whistle, if that could be performed. It is insisted by learned counsel for the railway company that the thought embraced in the qualification made by the trial judge was already implied in the language of each request, which called the attention of the jury to the duty of the railway company to do everything that it could do to prevent an accident when an obstruction appeared in front of the moving train. Certainly it was so implied, and, if so, there was no objection, or could be no reasonable objection to plainly expressing such implication. We do not think that it resulted in an undue emphasis on this special feature of the case, as insisted in the briefs of learned counsel.

After disposing of these matters, the learned court of civil appeals addressed itself to an assignment which complained of the following language appearing in the charge of the trial judge in each of the cases:

"If a witness be shown to have sworn willfully, falsely, and corruptly in one material respect, you will reject his testimony altogether, except in so far as it is corroborated by other credible evidence."

The court of civil appeals sustained this assignment, and we think they acted correctly in so doing. The word "will" was equivalent to "shall" or "must,"

as used in the excerpt quoted, and was equivalent to withdrawing from the jury all of the evidence which they might deem of the character indicated. This was clear error. It is true that, where the jury believe that a witness has sworn in the manner indicated in the excerpt, they may, or are at liberty to, disregard the evidence altogether, except in so far as it is corroborated by other credible evidence. The great weight of authority so states the rule. The jury should not be told that they must disregard such evidence. This was equivalent to denying the parties the constitutional right of a trial by jury, or, which is tantamount to the same thing, to not permitting their evidence to be considered by the jury. It appears in the charge of the trial judge in all the cases. It is true that this error seems not to have been formally assigned in the Artie Morgan case, but only in that of Claude and Carl Morgan; still all the cases were heard together in the court of civil appeals, and the error was there considered, and it is of so great a character, in deprivation of constitutional right, that it is the duty of the court, in furtherance of justice, to consider the error as if it were assigned in both cases, the matter appearing in both, and pertinent to both. We do not think that chapter 32 of the Acts of 1911 would apply to such deprivation of constitutional right. Of course, we cannot say as to which one of the witnesses the jury may have thought that the charge was applicable. But we do know, as shown by the record, that very strong attacks were made by the plaintiffs

below on the evidence of the engineer, the fireman, and the flagman Blakeley, the vital witnesses on the part of the railway company. These attacks were made as to the engineer and Blakeley, and, indeed, as to the fireman, through the agency of conflicting evidence, and by stringent cross-examination. Furthermore, as to the fireman, there was a direct attack made by showing, through certain witnesses, that he had made out of court statements different from those made in court. There were also witnesses introduced directly attacking his character.

For the error committed in giving the erroneous instruction just mentioned, all of the cases must be reversed and remanded for a new trial.

There is one more error, one occurring alone in the Claude and Carl Morgan cases which should be noticed, before we close this opinion. It is this:

The witness Christian was introduced by plaintiffs below, and testified in effect that the fireman was a young man of bad character when he lived in the witness's neighborhood twelve or thirteen years before the trial occurred. Mr. Christian was confronted with the following letter:

"Wilford, Wilson County, Tennessee.

November 10, 1902.

"To Whom it May Concern: I have known Robert Ward all of his life, and found him to be a hard working boy, and the best thing I can say is that he helped buy his widowed mother a home, and she now lives on it in a mile of me. I never knew anything wrong

with him.   I always considered him a peaceable and quiet boy.

Very respectfully,

S. P. CHRISTIAN, J. P."

Mr. Christian admitted writing this letter, but the trial judge would not permit it to be read to the jury. The learned court of civil appeals rightly held that this was error.   Certainly it was proper matter to be used in cross-examination of the witness Christian, since it tended very strongly to discredit the testimony then given by him as to the character and reputation of the fireman, Robert Ward, when he lived in Christian's neighborhood.

As already indicated, for the errors above mentioned and sustained, the judgments must be reversed, and the causes remanded for a new trial.   The plaintiffs below will pay the cost of the appeals in these cases.