HENRY NOHSEY and HUGH SCHWAB, Doing Business as NOHSEY & SCHWAB v. ARMOUR SLOVER.

Western Section.   June 30, 1931.

Petition for Certiorari denied by Supreme Court, February 13, 1932.

Miles, Waring & Walker and Wassell Randolph, all of Memphis, for plaintiff in error.

Wilson, Kyser, Armstrong & Allen and W. E. Krafft, all of Memphis, for defendant in error.

OWEN, J. Armour Slover hereinafter called plaintiff recovered a judgment in the Circuit Court of Shelby County, for $22,500 for personal injuries. He was struck on one of the streets of Memphis, March 8, 1929, by a truck owned by Nohsey & Schwab, hereinafter called defendants. The accident happened about noon. Defendants' truck was driven by Ollie Jones, a colored man fifty years of age, and who had been working for the defendants for twenty-five years. He was the regular truck driver for the defendants who are in the sheet metal business, and have been in such business for a number of years, in Memphis, Tennessee.

At the time of the accident, the plaintiff was walking in a westwardly direction, walking along the north side of Union Avenue, which is a much travelled Avenue, and runs east and west. Union Avenue is 50 feet wide from curb to curb. When the plaintiff approached Dudley Street, which runs north and south, and is twenty-six feet and four inches wide where it enters Union Avenue, he looked in both directions, before starting to cross and while walking across Dudley Street and when about half way across the street, the plaintiff was struck by the defendants' truck. Plaintiff received very serious injuries which will be discussed later.

There were seven counts in plaintiff's declaration. The first count relies upon common law negligence. It was insisted that the driver, at the time of the accident, was operating the truck at an excessive speed, and he failed to keep a proper lookout ahead.

The remaining counts allege the violation of six City ordinances, as follows:

(1) An ordinance requiring a driver, before turning from one street to another, to see that such movement can be made in safety.

(2) An ordinance requiring the driver of an automobile to keep a vigilant lookout.

(3) An ordinance prohibiting driving of an automobile recklessly, or at a speed to endanger life or limb.

(4) An ordinance prohibiting the turning of a corner at a speed greater than ten miles an hour.

(5) An ordinance fixing speed limit for trucks at twenty miles per hour.

(6) An ordinance requiring a driver, when turning a corner, to turn as near the right-hand curb as possible.

Defendants filed pleas of not guilty and contributory negligence, and that the accident was the result of a sudden emergency cast upon the defendants' driver.

It appears that the driver of the truck was on the north side of Union Avenue, going west, the same direction that plaintiff was traveling, and when the driver reached Dudley Street, a woman driving an automobile came out of Dudley Street into Union Avenue, and the truck driver insists that he had to make a sudden turn to the right, into Dudley Street to avoid striking the woman in the automobile, and in so doing he struck the plaintiff.

The cause was submitted to a jury which returned the verdict in favor of the plaintiff, for the amount heretofore stated.

The defendants seasonably filed a motion for a new trial which was overruled. They perfected an appeal, and had signed and filed a proper bill of exceptions and have assigned nine errors in this cause. There was a motion for a directed verdict at the conclusion of all the evidence, which was overruled.

The assignments of error will be disposed of under four groups:

Group one contains assignments one and two, and these are:

First, there is no evidence to sustain the verdict.

Second, the Trial Court erred in refusing to grant defendants' motion for a directed verdict, made first at the close of plaintiff's proof and renewed at the close of all the proof.

Group two consists of assignments three, four, and five, which are certain excerpts complained of from the Court's charge.

Group three consists of assignments six, seven and eight, which complain of the Court's action in refusing to give certain special instructions offered by the defendants.

The last assignment, number nine, insists that the verdict is grossly excessive and evinces passion, prejudice or caprice on the part of the jury. It is insisted in support of this assignment that

the verdict should have been set aside, or at least the Court should have entered a remittitur to correct the same.

This case was ably argued by counsel for both parties at the bar on the day it was heard in this Court. We have been furnished with elaborate briefs, covering every phase of the case.

It is insisted on behalf of the defendants in support of the first two assignments, as follows:

(1) Plaintiff failed to prove any of the acts of negligence alleged in the declaration.

(2) The Court charged the jury that if the defendants' theory of the accident was true there was no liability.

(3) The defendants' theory was uncontradicted and unimpeached by any evidence.

Negligence is never presumed from the happening of an accident. Negligence must be proven. De Glopper v. Railway & Light Co., 123 Tenn., 633, 134 S. W., 609.

If there was sufficient evidence to carry the case to the jury, there was some material evidence to support the verdict, so the first two assignments of error should be considered together. 139 Tenn., 37, 201 S. W., 131, 142 Tenn., 678, 222 S. W., 1053; Cullom v. Glasgow, 3 Tenn. App., 444.

It is admitted by counsel for the defendants that the plaintiff was guilty of no contributory negligence.

The plaintiff testified that as he approached Dudley Street where it intersects Union Avenue, and before starting across Dudley Street, he looked in both directions and then started to cross Dudley Street on a crosswalk. In the center of Dudley Street there was a cast iron stop sign, called by some of the witnesses, a turtle back, by some, a mushroom, and by some a button. This stop sign indicated that traffic from the north, on Dudley Street, going south into Union, should stop before entering Union Avenue. As plaintiff reached this stop sign he was struck by the defendants' truck, which had approached Dudley Street from the east and swerved from Union Avenue into Dudley Street. Plaintiff was struck a terrific blow in the back. The truck ran over the stop sign, broke it, crashed into a Yellow Cab, which had stopped in obedience to the stop sign, and defendants' truck stopped about 18 or 20 feet north of the stop sign.

At the time of the accident, Dr. Kinsey Buck, a reputable, practising physician of Memphis, was seated in his automobile, which was facing east and which was stopped on Union Avenue, at Dudley Street, preparatory or waiting for the proper opportunity to turn north into Dudley Street.

46

The plaintiff, when struck, was rendered unconscious, and he did not see the truck until about the time it struck him. Dr. Buck testified that he was waiting until he could get an opportunity to turn north, as there was quite a number of cars going east and west on Union Avenue, and while he was waiting on the south side of Union he saw the plaintiff on the east side of Dudley, that the plaintiff looked around and started to cross the street, the witness said the first thing he knew there was a truck come in and swerved and hit the plaintiff. The witness did not see the truck until it got within 10 feet of the man that was hit, the truck came from the east and the witness saw it as it was making the turn. This witness said that he could not say how fast the truck was going, but it was going pretty fast in turning a corner, that his recollection was that it was going too fast to go around the curve, but that it was not going fast enough to turn over as the truck did not turn over, that it was going about the ordinary speed a truck would travel up and down Union Avenue.

W. H. Butler, who was working at a filling station on the corner of Union and Dudley, testified that he was putting air in a customer's tire and did not see the truck strike the plaintiff, but heard the brakes on the truck squeak as the driver put on the brakes, and he heard the impact or collision, looked around and he saw plaintiff turn over in the air and fall.

Dr. Buck testified that the driver of the car did not blow his horn as he turned the corner.

The defendants introduced their truck driver, Ollie Jones, colored, who was fifty years of age, and who had been working for the defendants for twenty-five years. They also introduced one C. L. Boatwright, the driver of the Yellow Cab, which was also struck by the defendants' chauffeur.

The truck driver testified in regard to the accident as follow:

"A. Yes, sir. Well, as I was coming east on Cleveland going west on Union Avenue. I got down to Dudley Street, approaching Dudley Street about, and I looked that way and seen cars coming that way and some of them passing long before I got there, but I was still going, and there was another car and a Yellow cab, and I seen it and seen the car coming to Union, and as I neared to Dudley Street—well, I was about twenty feet of where the street crossing runs into Union, and there was a woman driving a car. She got up to the stop sign, and she slowed up about ten feet beyond the stop sign, and run up to the stop sign and slowed up, you know, like she was going to stop, and me still coming, and you see I thought she was going to stop, and just as the nose of my car cleared the sidewalk of Dudley she shoots right in front of me and turned to her left and she came right on into the head

of my car. By her turning into me that way if I would stop right quick. . . .

"If I stopped she would hit me and my only chance at the present was to duck away from her, and as I ducked away from her my car headed into Dudley, and right there was the Yellow Cab standing at the stop sign, and I hit him a glancing lick, you know, and as I hit him a glancing lick and run a little bit more to my left there was a man crossing the street, you see, and I struck the man, you see, and knocked him about four feet from my right fender. That is what I hit him with, and set him down on his knees like that (illustrating) and I stopped my car. He was sitting like that and I jumped out, you see, to get him."

Boatwright testified that he was driving a Yellow Taxicab and he followed the woman who was driving an automobile down Dudley Street, and that when she was within two or three car lengths of the mushroom stop sign she stopped and he stopped his car, then she rolled up to the mushroom sign, slowed down, with her front wheels in the gutter on the north curb line of Union Avenue and stopped; then she started right out into Union Avenue making a leap across the street." The witness was then asked "what happened," and he testified:

"This truck coming west on Union turned right in and when he hit the mushroom it knocked my back hub cap off and right opposite at the same time, the gentleman standing right over there, the truck struck him about the time that it hit my back hub cap."

He testified that the woman did not stop, but kept going.

Dr. Buck testified that he did not see any woman driving out into Union Avenue. On cross-examination, Jones, the driver, testified as follows, in answer to the following question:

"Q. If she had stopped at the stop sign there would have been no accident, that is your theory? A. There wouldn't have been if she had drove across the street making the right turn, but she turned across."

Boatwright, the driver of the Yellow Cab, testified that the woman came out right ahead of him to the mushroom sign and right straight out.

Jones admitted that if the woman had come straight out into Union there need not have been any accident, that she turned suddenly to the left and he was trying to dodge her is why he cut his truck into Dudley Street.

Boatwright testified that she did go straight out into Union Avenue, and it appears that the witness, Boatwright, had given a signed statement shortly after the accident in which he stated that the truck driver was coming at a very fast rate of speed, too fast to stop, and that he estimated the speed of the truck at twenty-five

miles an hour. At the trial, Boatwright failed to fix the speed of the truck, and did not give any estimate as to how fast the truck was moving. Although he was an experienced taxicab driver, he refused to give any estimate as to the speed of the defendant's truck just prior to striking the plaintiff.

It appeared that within ten days after the accident, the witness Boatwright made a signed statement in which he stated that the defendant's truck, when it turned the corner, did so at a speed of twenty-five miles per hour.

"Where an automobile driver who by negligence of another, and not by his own negligence is suddenly confronted by an emergency and is compelled to act instantly to avoid a collision or injury, he is not guilty of negligence if he makes such a choice of a person of ordinary prudence placed in such condition might make, even though he did not make the wisest choice. But the driver of an automobile cannot successfully invoke the emergency rule just stated where his own negligence led him into the emergency." Cullom v. Glasgow 3 Tenn. App. Rep., 443.

Ollie Jones, defendants' driver, testified that a woman driving a big automobile created the emergency that caused him to swerve the truck to the right and into Dudley Street, to avoid striking the woman and the big car. However, Jones, it appears, testified differently in the instant case to the testimony he gave at the police court, shortly after the accident. The stenographer, who took Jones' testimony at the city court, was permitted to read Jones' version of the accident as related by him in the city court.

Jones testified that he applied his brakes as soon as he saw the emergency, and as he turned into Dudley Street he struck the mushroom sign with his truck, broke the sign, struck the Yellow Cab, struck the plaintiff, and according to the witness and driver's estimate, the truck proceeded, after the collision, fourteen or fifteen feet. The driver testified that if the woman had driven straight across Union Avenue after she stopped at the stop sign, there would have been no emergency.

Boatwright, the driver of the Yellow Cab and just behind the woman in the big car, stated that the woman drove straight out into Union Avenue, saying:

"Q. State whether or not she went around the center of the intersection, or did she cut the intersection? A. No, sir. She came right out ahead of me to the mushroom and right straight out."

It is admitted that the woman in the big car stopped at the stop sign, and it is material as to whether she suddenly moved in front of Jones, the truck driver, and made a sharp turn to the left and to the east, or whether she came out straight in front of him and

onto the south side of Union. Boatwright testified that she went straight out, while Jones testified that she suddenly turned to the left in front of his truck.

We are of the opinion that from all the testimony there is evidence tending to show that the driver, Ollie Jones, after seeing this woman waiting at the mushroom sign, took his eyes off of the street ahead of him, and when he looked again the woman was going out into Union Avenue. Furthermore there is evidence to show that the driver did not have his truck under proper control. He turned into Dudley Street at a very rapid rate of speed, he failed to sound his horn, and he was going at an excessive rate of speed. And the jury found that the driver of the truck was negligent in leaving Union Avenue and turning suddenly into Dudley Street. We are of the opinion that it is a question for the jury, under all the facts, to say whether or not defendants' driver was confronted with a sudden peril, and in the emergency thus presented he acted according to his best judgment, and although for the want of time in which to form a judgment, and whether or not he was chargeable with negligence.

It results that we find no error in overruling the motion for a directed verdict at the close of all the evidence in the cause. And we find there is evidence to sustain the verdict. The first two assignments of error are overruled. Railroad v. Morgan, 132 Tenn., 1, 175 S. W., 48.

"The driver of an automobile cannot successfully invoke the emergency rule where his own negligence led him into the emergency." Allen v. Schultz (Wash.), 6 A. L. R., 676-181, Specific 916.

In the case, Carpenter v. Campbell Automobile Company, 140 N. W., 225, 4 Neg. and Com. cases, p. 1, it was held, "that the jury might, too, have found that if Black had his automobile under perfect control, as he should have had, he might have stopped the same after the emergency had passed and have prevented the injury. The testimony is that the automobile, running at the rate of speed authorized, might have been stopped within fifteen or twenty feet."

The witness, Ollie Jones, stated that he could have stopped the truck in from ten or twenty feet, yet after the emergency he ran his car something like twenty feet or more before he hit the stop sign, which he broke, and then after breaking the stop sign, striking the Yellow Cab and striking the plaintiff, he said that his car ran about the length of a table, where the trial was being held. And the records states that the table was fourteen feet in length.

As to the assignments under group two, complaining of the Court's charge, the 3rd assignment complains of the Trial Judge telling the jury, that in this case they had the doctrine of sudden emergency, and whether or not there was a sudden emergency was a question of

fact for the jury to determine. If they found there was a sudden emergency existing, it was the duty of the Court to tell the jury how to apply the law in reference to that doctrine of sudden emergency.

It is insisted in support of this assignment, that whether or not there was a sudden emergency should have been passed on as a matter of law and, "that the Court in leaving it to the jury to determine whether or not there was an emergency, necessarily and erroneously caused a doubt to the jury's mind as to the truth of the defendants' evidence, which in no way had been contracted by any proof and was unimpeached."

We are of the opinion that as heretofore stated as to whether or not there was a sudden emergency was a question of fact to be submitted to the jury. The defendants' two witnesses had contradicted each other.

The fourth assignment complains of the Court further telling the jury, "whether or not the negligence of the defendants' driver helped to bring about the emergency relied on," and whether the negligence of the woman driving out of Dudley Street was the sole cause of the emergency," or whether "it was the negligence of both the woman driver and the defendants' driver caused the accident," was a question of fact for the jury to decide. We think this instruction was proper, and this assignment is overruled.

The fifth assignment is to that portion of the Court's charge, as follows:

"Gentlemen of the jury, where a witness is upon the stand and delivers evidence in a court and makes statements before the jury as to the existence of facts, one of the methods of impeaching the testimony of that witness, or one of the methods of lightening the weight, faith, credit and value that you should give to that witness is by showing that that witness at another time made a contradictory statement about what he tells you gentlemen while upon the witness stand. That contradictory matter—his contradictory statements—are permitted to go before you, not as substantive or independent evidence of the existence of those facts, but is to be considered by you in determining what weight, faith, credit and value you would give the testimony of the witness as delivered before you at the trial."

It is insisted that this excerpt from the court's charge was prejudicial error to the defendant because it was directed at defendants' witness, Boatwright, against whom an unsuccessful effort had been made to contradict his evidence.

We do not find that the defendants were prejudiced by this statement from the Court. The jury is not told that Boatwright or any other witness had been contradicted. It is the same rule stated

which applies to the impeachment of witnesses by making contradictory statements if the jury sees fit to consider whether or not the contradictory statement has been made, simply stating the rule of law that the jury had the right to invoke in weighing the testimony of any or all witnesses who had testified in the case on trial.

All the assignments, complaining of the Court's charge, and which are grouped in group number two, are overruled and disallowed. At the conclusion of the Court's charge, a large number of special requests were offered by the defendants: three of these special requests are made the basis of assignments, six, seven and eight, and by these special requests, the defendants asked the Court,

(1) To instruct the jury that in considering the statement of Mr. Krafft that the witness, Boatwright "told him that the defendants' truck was traveling at the rate of twenty-five miles per hour at the time of the accident is not evidence that the truck was going at such a rate of speed. The sole purpose for which you may consider this testimony is to test and weigh his sworn testimony as to speed or any other matter made by Boatwright in the trial before you. This rule also applies to testimony about contradictory statements made outside this trial by any other witness in the police court or at any other time or place."

We are of the opinion that this special instruction asked for was properly refused, because the Court had told the jury the law relative to the impeachment by contradictory statements of a witness if any such contradictions had been made. The Court did not mention the name of any witness. In the special instruction, however, the witness Boatwright is mentioned, and we are of the opinion that while the defendants complained of the Court's charge as set forth in assignment five, they certainly could have complained about the attention of the jury being directed to the witness Boatwright, and his evidence, had the special request been granted. The other two special requests which were refused, both asked the Court in substance to instruct the jury that there was no evidence of an excessive rate of speed proven at the trial. And the jury was asked to disregard the allegations that the truck, at the time of the accident, was being driven at a high and dangerous rate of speed, and that they should not consider the allegation that the driver was not keeping a proper lookout ahead; these two special requests were properly refused.

The question of dangerous or excessive speed and whether the defendants' driver was on the proper lookout were questions for the jury, and we find some evidence tending to infer that the driver was not on the proper lookout. And we find evidence to the effect that the truck was being driven at a dangerous and excessive rate of speed, at least, it was not under proper control. All three of these

special requests were properly refused, and assignments, six, seven and eight, being group three are all overruled and disallowed.

We are of the opinion that the defendants have had a fair and impartial charge submitted to the jury. The ninth assignment complains of the verdict being excessive.

The plaintiff at the time of his injury was fifty-one years of age. He had an expectancy of twenty years.

Plaintiff was an industrious man and one of good habits. He had an earning capacity from $100 to $175 per month. He was not employed at the time of his injury but had been working up to a few months before the accident. His back was broken. He was paralyzed as a result of a pressure of a bone on his spinal cord until he was operated on several weeks after the accident. After the accident he was confined in the Methodist hospital for three weeks. He was then removed to Dr. Henry Hill's Clinic where he remained for five months. He was kept in a Bradford frame which was made of steel, covered with canvas. Weights were placed on his feet for the purpose of trying to straighten his limbs and back. He had no feeling from his waist down for several weeks, but the sense of feeling returned and with it intense pain.

The accident occurred March 8, 1929, the trial was had October 20, 1930, about nineteen and one-half months after the accident. About a month before the plaintiff left Dr. Henry Hill's clinic, a steel brace, something like a corset, was placed on plaintiff's back and around under his arm pits. He has had to wear this brace ever since, except at night when he tries to sleep. The plaintiff suffered a serious nervous shock following the accident, and he was constantly wet with profuse perspiration, which caused nervous prostration. At the time of the trial the plaintiff could walk or move around slowly on crutches. He has very little control over his feet, but apparently he shuffles along very slowly. By the accident, the plaintiff lost control of his bowels and had no control over the same at the time of the trial. He lost control of his bladder for a period of three months from the accident. He testified that when he moved on crutches he suffered extreme pain. Before the accident he was of a cheerful disposition, now he is of a morose or melancholy disposition, and often cries and weeps from his pain and distress.

Three doctors testified that the plaintiff was totally incapacitated, and there was very little hope for any improvement and if plaintiff improved it would be very slight. The testimony was "that the plaintiff is a hopeless cripple for life."

He had spent or contracted to spend $3550 for hospital bills, nurses, medicines, Doctors and Surgeons. The plaintiff cannot bathe himself.

We have no fixed rule whereby damages in a personal injury case may be assessed as a result of a mathematical calculation.

The plaintiff has cited in support of his argument that the verdict is not excessive, the case of Davis-Mize Co. v. George Weller, Jr., from Shelby County, and decided by this Court at the present term, petition for certiorari being denied June 10th of this year—in which a verdict for $20,000 was sustained. In the Weller case, Weller proved a much greater earning capacity than the plaintiff in the instant case, but nothing like the serious injury to his body. Weller was a younger man than the plaintiff in the instant case, and Weller had expended $2,000 for medicines and hospital bills. Weller had a serious fracture of his leg. There was some hope of the bones in his leg uniting. There was some evidence indicating that his leg might have to be amputated. This Court was of the opinion that $10,000, in the Weller case, was not excessive for the pain and suffering. A number of cases could be cited where $20,000 or $25,000 was sustained as not being excessive for a broken back, but in those cases they could be distinguished from the facts in the instant case. Every personal injury case has to be determined upon the facts peculiar to the case under consideration. In the instant case we have an expenditure of a little more than $3500. There is proof that more money will have to be expended upon the plaintiff for medical treatment, but when we deduct the $3500 from the total verdict we have $19,000 for pain, suffering, mental anguish and loss of services. On the question of loss of services, we are of the opinion, taking into consideration the uncertainty of employment and the uncertainty of life, and of good health, that it would be reasonable and just to give the plaintiff an average of one-half of his expectancy or ten years. And for this ten years, we are of the opinion that it would be reasonable to allow the plaintiff to recover for one-half of the time or for five years, at $100 per month, or allow him $6000 as compensation. That would leave the remainder of the judgment for pain and suffering, mental anguish and total disability, and we are of the opinion that $14,000 or $15,000 would not be an excessive verdict for the personal injuries, pain, suffering and mental anguish sustained by the plaintiff. The jury saw this plaintiff. He exhibited his body to the Trial Judge and the Jury. They saw him try to walk. The Trial Judge has approved this verdict, and we are sure that he gave the verdict due and proper consideration when he passed on the motion for new trial, and especially the grounds for a new trial wherein it was claimed that the verdict was excessive and so excessive as to show prejudice and caprice on the part of the jury.

"The amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person, to pass upon the

matter, is the Judge who presided at the trial and heard the evidence.'' Reeves v. Catignani, 157 Tenn., 173, 7 S. W. (2d), 38.

In the Catignani case our Supreme Court speaking through Mr. Chas. C. Trabue, Special Judge, said, ''The right to revise even the amount of the verdict by the process of suggesting a remittitur is a delicate one, and one that a Court should be slow to adopt.'' We are of the opinion that the verdict in the instant case is not excessive, and it is not a verdict that resulted from prejudice, passion or caprice on the part of the jury. All of the assignments are overruled and disallowed. The judgment of the lower Court is affirmed. The plaintiff will recover of the defendants the amount of judgment rendered in the Court below, with interest thereon from the date of its rendition, and all the costs of the cause for which execution will issue. 'Execution will issue against the defendant and his surety on appeal bond for the costs of the appeal.

Heiskell and Senter, JJ., concur.