STEWART et al. v. CROOK SANATORIUM et al.—69 S. W. (2d) 259.

Western Section. July 20, 1933.

Petition for Certiorari denied by Supreme Court, March 10, 1934.

Pearson & Hewgley, of Jackson, for appellant Dr. R. K. Hollingsworth and appellee Crook Sanatorium.

N. R. Barham, T. W. Pope, and S. J. Everett, all of Jackson, for appellee Mrs. R. L. Stewart and others.

SENTER, J. The parties will be referred to as in the court below, Mrs. R. L. Stewart et al., plaintiffs, and Crook Sanatorium et al., defendants.

Plaintiffs sued the defendants in behalf of herself and three minor children for alleged malpractice resulting in the suffering and death of the husband of plaintiff, Mrs. R. L. Stewart, and father of the three minor plaintiffs, and for whose benefit the suit is brought. The action grew out of alleged malpractice upon R. L. Stewart after he had received serious burns from a lamp which exploded, and he was carried to Crook Sanatorium, in Jackson, Tennessee, for treatment. He was a resident of Hardeman county, Tennessee, and received his burns in his home in Hardeman county, Tennessee. He was employed as assistant section foreman by the Illinois Central Railroad Company. Arrangements had been made by the Illinois Central Railroad Company with its employees, whereby the employees contributed monthly to a fund which would provide hospital facilities at Crook Sanatorium, and also medical and surgical treatment in the event of sickness or accident.

The declaration alleged in substance that after first aid had been administered to Stewart for the serious burns he was taken to Jackson, Tennessee, to Crook Sanatorium, and that defendant Dr. Hollingsworth, who was the president and general manager of Crook Sanatorium, took the patient in charge for treatment at the Sanatorium. That the patient was admitted to the Sanatorium on August 13, 1930, and that on August 20 Dr. Hollingsworth arranged to have an ambulance take the patient to the insane hospital at Bolivar, without first having arranged to have the patient admitted to the institution at Bolivar; that the patient had become delirious from pain and suffering, and that Dr. Hollingsworth and the Sanatorium were anxious to get the patient out of the hospital

at Jackson because in his delirium the patient was disturbing other patients in the hospital; that Dr. Hollingsworth negligently, wrongfully, wilfully, and maliciously sent the patient in an ambulance to the insane hospital near Bolivar, a long distance and over very rough roads; that no medical attendant accompanied the patient in the ambulance; that the ambulance was driven in a very reckless and careless manner and at a rapid rate of speed over a very rough road, causing the patient to suffer great pain, and exposed him to the foul air in the ambulance; that the patient left Jackson in the ambulance late in the afternoon, and when the ambulance and patient reached the insane asylum at Bolivar, the superintendent of that institution refused to receive the patient because the county judge of Hardeman county, the county of the residence of the patient, Stewart, after having the patient examined by a medical examiner, refused to issue the necessary commitment papers authorizing the hospital to receive the patient. The declaration alleges gross negligence on the part of the defendant Crook Sanatorium, and upon the part of Dr. Hollingsworth, in sending the patient to the West Tennessee Insane Asylum near Bolivar, without first arranging to have the patient admitted to said institution. The declaration avers that the patient was exposed to the rough treatment by reason of the careless and negligent manner in which the ambulance was driven and because of the serious condition of the patient at the time, and that the patient was returned to Crook Sanatorium after making the trip to Bolivar at a late hour of the night, and as a result suffered great physical pain and anguish, and also developed pneumonia from which the patient died shortly thereafter, all as the result of the negligence and inattention of the defendant, and for which plaintiff sued the defendant for the sum of $25,000.

Both defendants filed pleas to the declaration, and to both counts thereof, of the general issue of not guilty of the matters, wrongs, and injuries in manner or form as plaintiffs in the declaration averred.

At the hearing of the cause, both defendants, at the conclusion of the evidence, moved the court for a directed verdict in their favor. The court sustained the motion of defendant Crook Sanatorium, and directed the jury to return a verdict in favor of that defendant, but overruled and disallowed the motion of defendant Dr. Hollingsworth for a directed verdict in his favor. To the action of the court in sustaining the motion for a directed verdict in favor of the defendant Crook Sanatorium, plaintiffs excepted. To the action of the court in overruling the motion of Dr. Hollingsworth for a directed verdict in his favor, Dr. Hollingsworth excepted. The trial resulted in a verdict by the jury in favor of plaintiffs and against the defendant Dr. R. K. Hollingsworth in the sum of $5,000 and

the costs of the suit. The defendant Dr. R. K. Hollingsworth made a motion for a new trial, which motion was by the court overruled. The plaintiffs also made a motion for a new trial as to Crook Sanatorium. Both parties have appealed in error to this court. Plaintiffs have appealed from the action of the court in overruling the motion for a new trial and in directing a verdict in favor of Crook Sanatorium. Both parties have assigned errors. We will first consider and dispose of the errors assigned by plaintiffs.

By the assignments of error by appellant plaintiff it is said that the learned trial judge was in error in directing a verdict in favor of defendant Crook Sanatorium, for the reason that there was material evidence that should have been submitted to the jury on the question as to the liability of the defendant for the wrongs and injuries done plaintiff's intestate, and in holding that Crook Sanatorium, under the evidence, was not liable. Also that the court was in error in overruling its motion for a new trial for the same reasons.

It appears that Crook Sanatorium is an incorporated hospital in the city of Jackson. It also appears that there was an arrangement entered into between Crook Sanatorium and the Illinois Central Railroad Company whereby patients in the employ of said Railroad Company would be received into the hospital, and that for furnishing to the patients who were employees of the Railroad Company and who were entitled to be admitted to the hospital under the plan and arrangement between the Railroad Company and the hospital, a charge of $4 per day would be made for furnishing room and meals and the usual service rendered by hospitals of that type. It also appears that the Illinois Central Railroad Company employed certain physicians and surgeons in the city of Jackson to attend and treat patients sent to Crook Sanatorium by the Railroad Company, and that Dr. R. K. Hollingsworth was one of the physicians and surgeons in the city of Jackson employed on a salary basis by said Railroad Company to attend and treat patients sent by the Railroad Company to said Sanatorium or hospital. It appears that this is a separate and distinct contract made between the railroad company and Dr. Hollingsworth from the contract made between Crook Sanatorium and the Railroad Company, and for a separate and distinct service. It appears that when the patient was received into Crook Sanatorium, Dr. Hollingsworth was called to attend the patient. He makes his office in the Sanatorium. Dr. Hollingsworth proceeded to take charge of and treat the patient during the time the patient was in the hospital. The patient was suffering from severe burns, which covered a large area of the patient's body, probably 60 per cent or more of the body had been burned by the lamp explosion. These burns were in the main second and third degree burns. The most serious were on the abdomen and on the

chest and side. Dr. Hollingsworth was the second vice-president of Crook Sanatorium. Dr. Jerry Crook was the president of Crook Sanatorium, and Dr. Fitts was first vice-president. Each of these three doctors and surgeons maintained offices in the Sanatorium. Dr. Crook was out of the city of Jackson at the time Stewart was received into the hospital, and was not there at any time during the time Stewart was a patient in the Sanatorium.

We have carefully examined the record, and we think it appears from the undisputed evidence that Dr. Hollingsworth served the patients sent to the Sanatorium by the Railroad Company under a separate and distinct contract of employment with the Railroad Company. We are also of the opinion that the uncontroverted evidence shows that the services required by the Railroad Company of its physicians and surgeons employed by it to treat its patients is separate and distinct in character and nature from the service rendered to its patients by the Sanatorium. We are also of the opinion that under the uncontroverted evidence Dr. Hollingsworth in his capacity as physician and surgeon to this patient had full and complete charge of the patient, and the patient was under his personal care and attention and separate and apart from his official connection with Crook Sanatorium, and that Crook Sanatorium, under its contract with the Railroad Company, was under the contractual obligation of furnishing room and meals in the Sanatorium and the usual nursing, but was not required to furnish medical or surgical treatment to persons or patients sent there by the Illinois Central Railroad Company.

We are therefore of the opinion that under the undisputed evidence, the defendant Crook Sanatorium was in no sense responsible for the treatment of the patient by Dr. Hollingsworth, and did not have any control over the treatment of the patient by Dr. Hollingsworth. We are not unmindful of the contention made by this appellant that Dr. Hollingsworth in seeking to have the patient removed to the insane asylum, because of the disturbance which the patient created and the discomfort occasioned to other patients in the hospital, was performing an official act upon his part as an officer of said Sanatorium to protect other patients from the unusual noise and disturbance created. However, we are of the opinion that all that Dr. Hollingsworth did in the matter of treating this patient and in seeking to have him admitted to the insane asylum at Bolivar was in the course of his employment in the capacity of physician and surgeon employed on a salary by the Railroad Company to attend and treat its patients, and was not in the performance of any duty that he owed to the defendant Crook Sanatorium. It results that we find no error in the action of the trial judge in overruling and disallowing the motion for a new trial

made by this appellant, and in directing a verdict in favor of the defendant Crook Sanatorium.

This brings us to a consideration of the assignments of error made by appellant Dr. R. K. Hollingsworth.

The first assignment by this appellant is to the action of the court in overruling the fourth ground of his motion for a new trial, which is: "Because there is no competent or material evidence in the record to support the verdict and judgment." The second assignment is to the action of the court in overruling this appellant's motion for a directed verdict in his favor made at the conclusion of all the evidence, and on the ground that there was no material evidence that would warrant the submission of the issues to the jury. The third assignment is to the amount of the verdict, and by which it is said that the verdict is so grossly excessive as to indicate passion, prejudice, and caprice on the part of the jury. The fourth assignment is directed to a portion of the general charge of the court to the jury specifically referred to and set out under this assignment. The fifth and sixth assignments go to the action of the court in refusing to give in charge to the jury the defendant's special requests Nos. 8 and 9. The seventh assignment presents the question that the court should have submitted to the jury, under proper instructions, the question of whether the driver of the ambulance in which the patient was sent to Bolivar was the agent and servant of Sparkman-Thompson, Inc., or of this defendant, and whether or not this defendant is liable for the negligence of the driver of the ambulance.

The eighth assignment is directed to the action of the court in excluding certain evidence set out thereunder, and in sustaining exceptions thereto. By the ninth and tenth assignments is presented the question that the motion for a new trial should have been granted because of certain alleged improper conduct upon the part of certain of the jurors while considering the verdict; that certain of the jurors in the course of the deliberations by the jury made statements to and in the presence of the jury with reference to the effect of certain burns suffered by other persons that contradicted the evidence of the doctors who had testified; and that these statements made constituted evidence considered by the jury, and not developed in the course of the trial, and was material to the issues submitted to the jury, and highly prejudicial.

In disposing of the first and second assignments of error it becomes necessary to review the evidence and the facts. Plaintiff introduced witnesses by which it was sought to be shown that Dr. Hollingsworth negligently and wrongfully exposed plaintiff's intestate to unnecessary pain and suffering, in having the patient sent to the West Tennessee Insane Asylum without first ascertaining that the patient would be admitted to that institution; that as a result the patient suffered great pain and anguish; that the trip

resulted in having the bad burns, which had the appearance of being in the process of healing, broken open; and also that pneumonia developed soon after the return of the patient from the long, tedious, and painful trip from Jackson to the West Tennessee Insane Asylum and return to the hospital in Jackson, resulting in the death of plaintiff's intestate. Members of plaintiff's family went with the ambulance on this trip, and they testified that the ambulance was driven at a very high and reckless rate of speed over very rough roads in making the trip; that the patient was greatly jarred and shaken by the rough handling of the ambulance by the driver over rough roads; that the patient was in great pain and suffered because of the jolting and rough driving; that the patient became highly delirious on the trip and hollered out several times, and in his delirium tried to get off of the ambulance couch and had to be held on the couch, on account of the suffering resulting from the rough driving and the exposure of the trip. It also appeared from plaintiff's proof that the driver of the ambulance, acting under the instructions of Dr. Hollingsworth, stopped at Bolivar to secure from the county judge the necessary papers for the admission of the patient to the insane asylum; that the county judge summoned two physicians of Bolivar to examine the patient touching the mental condition, and for the purpose of ascertaining whether or not the patient was a proper subject to be admitted to the insane asylum; that as the result of the examination made by these two physicians they found, and so reported to the county judge of Hardeman county, that the patient was delirious from pain as the result of the burns, but not an insane man so as to warrant his admission as a patient from Hardeman county to the West Tennessee Hospital for the Insane; and whereupon the county judge declined to issue the necessary papers committing the patient to the state institution. Notwithstanding this refusal by the county judge to issue the papers, the driver of the ambulance proceeded on to the insane asylum with the patient, and upon reaching the asylum, Dr. Cocke, the superintendent, inquired if the county judge had issued the papers. He found that the county judge had refused to issue the papers as a result of the examination by the examining physicians he had called to make this examination. At that time the patient seemed to be suffering much pain and was highly delirious, and Dr. Cocke had one of his assistants to administer a quarter grain dose of morphine hypodermically, but declined to receive the patient into the institution, and the driver of the ambulance, after communicating with Dr. Hollingsworth in Jackson that the county judge had refused to issue the necessary papers, and that Dr. Cocke had refused to receive the patient into the asylum, was directed by Dr. Hollingsworth to return the patient to Jackson. Certain members of the family testified that Dr. Hollings-

worth informed them, on the afternoon that the patient was sent to Bolivar, that the patient was better of his burns and free of temperature, but that he was insane and that he was sending the patient to the insane asylum at Bolivar, where the patient could be better treated of the disorder; that this was the first knowledge that the wife and members of the family had of the intention of Dr. Hollingsworth to send the patient to the insane asylum at Bolivar; that whatever plans or arrangements Dr. Hollingsworth had made with respect to sending the patient to the insane asylum had not been previously disclosed to his wife and brother and other members of the family; that Dr. Hollingsworth simply informed them that he had made arrangements to have the patient taken in an ambulance to the insane asylum and had made arrangements for the patient to be received there, and they accompanied the patient in the ambulance; that two nurses, or student nurses, got into the ambulance later and made the trip, but did so at the invitation of the driver of the ambulance and not by direction or procurement of Dr. Hollingsworth, and did not go along for the purpose of attending the patient, but merely for the trip.

It also appears that Dr. Hollingsworth, earlier in the day, went to the West Tennessee Insane Asylum for the purpose of consulting Dr. Cocke with the view of having the patient sent there; that when he reached the asylum he gave to Dr. Cocke a full history of the patient, the nature and extent of the burns on his body, and also his delirious mental condition. Dr. Cocke testified that he did not think that the patient was legally insane from the description given him by Dr. Hollingsworth, and that the patient was suffering from delirium as a result of the burns. He testified, however, that the West Tennessee Asylum for the Insane, of which he was the superintendent, was better equipped and better prepared to take care of the patient in his delirious condition than was Crook Sanatorium, and that he informed Dr. Hollingsworth that he would be glad to receive the patient into the asylum if Dr. Hollingsworth would secure the proper commitment papers from the county judge of Hardeman county, the county of the residence of the patient, and explained to Dr. Hollingsworth the procedure to be taken before the county judge. Dr. Hollingsworth called to see the county judge at Bolivar and explained to him the situation, and the county judge explained to Dr. Hollingsworth that before he could issue the necessary papers committing patient to the asylum, the patient would have to be sent to Bolivar and examined by physicians there, and if they found that he was insane upon investigation, he would issue the necessary papers. Whereupon, Dr. Hollingsworth returned to Jackson and arranged for an ambulance from Sparkman-Thompson, Inc., undertakers, and to have Sparkman-Thompson convey the patient in the ambulance first to Bolivar to be examined and then

to the asylum near Bolivar. According to the evidence of plaintiff's witnesses, the patient developed pneumonia within two or three days after he was returned to Crook Sanatorium, and died on August 27, 1930.

There is very little conflict in the evidence with reference to the above facts, except that the driver of the ambulance and another man who attended the driver of the ambulance, and also the nurses, testified that the ambulance was very carefully driven and at a very moderate rate of speed, and driven very slowly over all rough places in the road. It also appears that the ambulance furnished by Sparkman-Thompson, Inc., was comparatively new and one of the most improved and modern type in use; that it had shock absorbers and heavy springs, was properly ventilated, and equipped with the most comfortable and modern couch upon which the patient rested; that it was also equipped with electric fan, and with hot water in a hot water bag, and ice water, and was in all respects a modern ambulance with all modern equipment and appliances intended for the comfort of patients using the same.

There is very little conflict in the evidence as to the effect upon the patient of the trip made from Jackson to the asylum and back. Several physicians testified that burns of the nature suffered by plaintiff's intestate, covering 60 per cent or more of the body, would inevitably result fatally. These physicians also testified that the treatment for the burns given by Dr. Hollingsworth was considered the best and most modern treatment of burns of that character. They also testified that the most serious burns were burns on the abdomen and chest, and that second and third degree burns on the abdomen and chest involving the area covered by the burns on this patient would result in death, regardless of the treatment; that such burns were fatal in all cases. Dr. Cocke testified that according to medical authorities, burns of that character always resulted fatally to the patient. One of the doctors introduced by plaintiff, Dr. George M. Dorris, testified at some length on the subject. He was one of the physicians who examined the patient in the investigation before the county judge. He did not go into the ambulance, but the patient was in full view. The patient did not have on any clothing, but a sheet covered the lower part of the body. Dr. Dorris could see the burned places and area on the abdomen and chest. He stated that there was the odor of decomposing flesh from the burns, and that bloody substance was oozing from the burns; that the patient was semi-rational, and seemed to be in pain, but was delirious at the time he made the examination; that he did not consider that the patient was "insane" in the sense that the term was usually employed, but that his delirium was the result of pain and suffering. This witness testified that pneumonia could result from exposure such as the patient was subjected to on the trip from Jack-

son and return. However, on cross-examination he testified with reference to the different types of pneumonia, and admitted that hypostatic pneumonia was a type of pneumonia that usually resulted from the patient having to lie in one position for a considerable length of time, and also from poor blood circulation as the result of poison in the system from the burns of that degree. Dr. Cocke, also a witness for plaintiff, testified on the same subject that hypostatic pneumonia usually resulted from the patient having to lie in one position an unusual length of time; and also from poison in the system as the result of burns or other injuries, due to bad circulation and bad heart action.

According to the uncontradicted evidence in the record, in about four days after the patient was returned from Bolivar to Jackson, hypostatic pneumonia developed, and the patient only lived a few days. While it is true that Dr. Cocke and Dr. Dorris, as expert witnesses introduced by plaintiff, testified that they did not think that the trip from Jackson to Bolivar and return could have been good for a patient, and that it could have resulted in pneumonia developing, yet Dr. Cocke, especially, would not attribute the development of pneumonia to the trip to Bolivar and back in the ambulance. Dr. Dorris did not testify that the trip would superinduce hypostatic pneumonia, but the effect of his evidence with reference to the pneumonia was that the exposure of the patient on the trip could result in the development of pneumonia, and when his evidence on cross-examination is analyzed, he is not in disagreement with the other physicians who testified that hypostatic pneumonia would not have resulted from the trip. Dr. Dorris also testified that if lobar pneumonia would result from the exposure of the trip, it would result within from twenty-four to seventy-two hours, with seventy-two hours as the maximum. There is no conflict in the evidence as to the nature and extent of the · burns from which Stewart was suffering. They were in the main second and third degree burns, with the most severe burns over the abdomen and chest, the region of the anatomy that all the physicians agreed as the most serious and most calculated to produce death. There is practically no conflict in the evidence as to the burned area, and this was from 60 to 70 per cent of the body, and more severe on one side of the body than on the other side. This necessitated having the patient lie in one position and on one side. According to all the medical expert evidence in the record, hypostatic pneumonia more frequently results from the patient having to lie in one position for a considerable length of time. We do not find any conflict in the evidence as to the type of pneumonia which this patient developed. According to the uncontradicted evidence, it was of the type referred to as hypostatic pneumonia. There is practically no conflict in the evidence that this type of pneumonia would not re-

sult from the discomforts and exposure of the patient in making the trip from Jackson to the insane asylum near Bolivar and return in the ambulance; that it was the result of the poison in the system as a consequence of the burns, and also the patient having to lie in one position for this length of time. There is also no conflict in the evidence of the medical experts who testified that these burns were of the nature and the type that would have necessarily resulted fatally, regardless of the treatment of the patient or of the discomforts and exposure, if any, suffered by the patient in making the trip.

In considering a motion for a directed verdict made by the defendant, either at the conclusion of plaintiff's evidence or at the close of all the evidence, that view of the evidence most favorable to plaintiff's case must be taken by the court, and, if there is any doubt as to the conclusion to be drawn from the whole evidence, the motion for a directed verdict must be overruled, and the case submitted to the jury under proper instructions by the court. Hines v. Partridge, 144 Tenn., 219, 231 S. W., 16.

As was stated by the court in Tennessee Cent. Railroad Co. v. Morgan, 132 Tenn., 5, 175 S. W., 1148, 1149: "Of course, it is true that, in passing on a motion for peremptory instructions, the court must take the most favorable view of the evidence appearing in the record supporting the rights asserted by the party against whom the motion is made."

Hence, in passing upon the first and second assignments of error by appellant Dr. Hollingsworth, this court must be governed by the settled rule in this state to the effect that if there is any material evidence, when considered in its most favorable view to plaintiff's case, the verdict of the jury will not be disturbed on appeal.

We have made a careful search of all the evidence contained in the record to discover if there is any conflict in the evidence as to whether or not plaintiff's intestate's death was caused by the trip which the patient took in the ambulance from Jackson to the West Tennessee Hospital for the Insane and return. We have hereinbefore set out and discussed the evidence bearing upon this question. There is some evidence in the record to the effect that the patient suffered more or less pain from the jolting of the ambulance, and according to the evidence of two of the witnesses who were in the ambulance on the trip with the patient, the patient showed evidences of suffering; and that the ambulance was driven in a reckless way and manner, and the patient was jolted considerably, and the burns were caused to crack open and to exude bloody water, and that the patient was partly conscious of the pain at times, although for the greater portion of the time the patient was delirious. However, there is no evidence in the record that this trip could have

resulted in the patient developing hypostatic pneumonia. The nearest suggestion of the trip resulting in pneumonia is the evidence of Dr. Dorris and Dr. Cocke. Both these doctors admitted that the trip would not have caused pneumonia of the type referred to as hypostatic. The evidence in the record is undisputed that the patient died on account of the serious burns, and the effects of the burns, and of hypostatic pneumonia. We are also of the opinion, as above set forth, that all the evidence by the several medical experts who testified in the case showed that Mr. Stewart would have died as the result of the serious burns regardless of the trip from Jackson to the asylum and back and regardless of the medical treatment; that the burns were of such a character as would inevitably result fatally to the patient.

If it be conceded that the trip in the ambulance was shown to be unnecessary and improper, and for insufficient reason, and therefore Dr. Hollingsworth was negligent in sending the patient from Crooks Sanatorium, and if it be further conceded that this trip caused the patient additional physical pain and suffering, and rendered the patient more uncomfortable, the fact remains that according to the evidence this did not contribute to the death of Mr. Stewart. It only operated to his physical pain and discomfort.

In this view of the case we do not think that there was any evidence to warrant the jury in arriving at the conclusion that this trip in the ambulance was the cause, or a contributing cause, of the death of plaintiff's intestate.

The next question is: If plaintiffs were not entitled to recover for the death of the deceased, would they be entitled to recover for the physical pain and discomfort and suffering of Mr. Stewart as the result of the trip in the ambulance, conceding the negligence of Dr. Hollingsworth in sending the patient away from the hospital at Jackson in his then condition? This suit is by the widow and the minor children of the deceased. Stewart had not instituted a suit against the defendants before his death. In the case of Daniel v. Coal Co., 105 Tenn., 470 et seq., 58 S. W., 859, 860, the court in the opinion refers to the artificial common-law rule, actio personalis moritur cum persona, and which rule prevailed in Tennessee until modified by chapter 17 of the Acts of 1851-52. In the opinion in that case the question was considered and discussed elaborately by Mr. Justice Caldwell, and the Code sections amending the common-law rule were referred to and construed. After referring to chapter 17 of the Acts of 1851-52, "which, with some transpositions and change of phraseology, appear as section 2291 in the Code of 1858," the court said:

"To facilitate the remedy saved by that section (Chambers v. Porter, 5 Cold., 277), the codifiers added sections 2292 and 2293. The former two sections were amended by sections 1 and 2, re-

spectively, of chapter 78 of the Acts of 1871. Section 2291, as so amended and carried into subsequent compilations, is as follows: 'The right of action which a person who dies from injuries received from another, or whose death is caused by the wrongful act, omission or killing by another, would have had against the wrongdoer in case death had not ensued, shall not abate or be extinguished by his death, but shall pass to his widow, and in case there is no widow, to his children or to his personal representative, for the benefit of his widow or next of kin, free from the claims of creditors.' (Milliken & V., sec. 3130 (Shannon's Code, sec. 4025)."

By section 4028, Shannon's Code. it is provided: "If the deceased had commenced an action before his death, it shall proceed without a revivor. The damages shall go to the widow and next of kin, free from the claims of creditors of the deceased, to be distributed as personal property."

In Daniel v. Coal Co., after a further discussion of the several enactments and amendments, the court states:

"Obviously, the last of them refers to the same class of actions as the other three. The object of the first enactment was to preserve to the widow and next of kin of a person dying from the wrongful act of another the benefit of the cause of action which would have followed that act if death had not ensued; and the subsequent enactments were made in furtherance of that single object.

"Death from wrongful act and existence of widow or next of kin are the two controlling facts, and they must coexist in every instance. When either of them is lacking, no one of these statutory provisions is applicable. If the person wrongfully injured by another commences his suit for damages while living, he does so under the general law; and if he dies from the injury sued for before judgment, leaving a widow or next of kin, his suit survives and may proceed to judgment, under the last-quoted provision of the statute (Code 1858, sec. 2293; Milliken & V., sec. 3133; Shannon's Code, sec. 4028), without revivor. But, if either of these essential elements—Death from wrongful act and existence of designated beneficiary—be wanting, that provision does not authorize the prosecution of a deceased plaintiff's suit without revivor, nor, indeed, does it authorize the revivor of such a suit. Like the other quoted provision . . . it applies only to the action possessing both of those elements."

It will thus be observed that the cause of action, to be maintained by the personal representative or by the widow or children of the deceased, must be predicated upon injuries sustained resulting in the death of the person injured, and this right is given by the statute and not by the common law which prevailed in Tennessee before the enactments above referred to. It will also be observed, from what has been said by the Supreme Court in the above case of

Daniel v. Coal Co., that if the deceased received injuries at the hands of a wrongdoer, but which injuries did not produce death, and for which suit was not brought for the injuries received while living, the action would not survive in favor of the personal representative or of the widow and minor children, since the statute does not make that provision.

We are therefore constrained to reach the conclusion that plaintiffs in the present suit could not maintain the action for physical pain and suffering of Mr. Stewart occasioned by the trip to the hospital for the insane, since the death of Mr. Stewart did not result, nor was it caused, by the ambulance trip, but was solely the result of the serious burns sustained by the deceased.

We will add that the declaration in this case was drawn in two counts originally, and the two counts were almost identical, except in the first count the declaration did not aver that the death of the deceased was the result of the trip made in the ambulance, and the second count did so aver, so that the first count of the declaration would appear to be a suit to recover for the pain and suffering and discomfort suffered by the deceased on account of the negligent conduct of the defendant in sending the patient to the West Tennessee Hospital for the Insane. Plaintiff was permitted to amend the first count of her declaration by averring that the negligence complained of was one of the proximate causes of the death of said R. L. Stewart. With this amendment the two counts of the declaration are substantially the same.

We are therefore of the opinion that there was no material evidence to support the verdict of the jury, since we hold that under the uncontradicted evidence in the record the death of Stewart did not result, nor was it caused, by the ambulance trip from Jackson to Bolivar and return, and further that plaintiffs do not have a cause of action for the pain and suffering and discomfort, if any, resulting to the deceased from the ambulance trip.

In this view of the case it becomes unnecessary to consider the other assignments of error of this appellant. However, we will add that we are of the opinion that the assignments of error based upon improper conduct of certain of the jurors, and what was said by the jurors in the jury room, constituted evidence on material matters and pertinent to the issues involved in the suit, and would so hold if the case was not to be reversed and dismissed for the reasons above set forth.

It results that the judgment of the lower court is reversed, and the suit is dismissed, at the cost of plaintiffs below, including the cost of this appeal.

Heiskell and Anderson, JJ., concur.