MRS. ZELMA B. GIPSON, Plaintiff-in-Error, v. MEM-
PHIS STREET RAILWAY COMPANY, Defendant-in-
Error. —364 S. W. (2d) 110.

Western Section. February 21, 1962.

Certiorari Denied by Supreme Court November 9, 1962.

Saul Kay, Jack N. Clemons, Memphis, for plaintiff in error.

George T. Lewis, Jr., Milburn K. Noell, Jr., Waring, Walker, Cox & Lewis, Memphis, for defendant in error.

CARNEY, J. This is a suit for the alleged wrongful death of the original plaintiff, Mrs. Zelma B. Gipson. On the trial below, at the conclusion of all the proof, His Honor, the Trial Judge, directed a verdict in favor of the defendant on the ground that the death of the deceased was not caused by the alleged unlawful act of the defendant.

The original plaintiff, Mrs. Gipson, aged 58, died on December 18, 1957, during the course of an operation for the removal of a brain tumor. Her children, the present plaintiffs, insist that her death was hastened by an electric shock which she received on September 11, 1957, while boarding one of defendant's electric coaches on Main Street in Memphis, Tennessee. Plaintiffs contend that the electric shock aggravated a dormant brain tumor, caused it to grow and spread very rapidly and that such electric shock was in fact a proximate cause of their mother's death within the meaning of our wrongful death act, T.C.A. Section 28-304.

Prior to the time of the shock Mrs. Gipson was apparently in good health but immediately after the shock her

physical condition deteriorated very rapidly, her speech was impaired, she became unable to dress herself and walked with the greatest difficulty. On the next day after the shock she consulted her personal physician, the witness, Dr. Ralph I. Goldman. Dr. Goldman saw Mrs. Gipson on September 12-13-16-19-22, and 26. His first diagnosis was post-electric shock syndrome with severe anxiety.

On October 29, 1957, Dr. Goldman, after Mrs. Gipson's condition became progressively worse, suspected a brain tumor and referred her to a neurosurgeon, Dr. C. D. Hawkes. After a series of tests Dr. Hawkes confirmed the diagnosis of brain tumor and suggested an operation as the only hope of recovery. An operation was performed on December 16, 1957, but Mrs. Gipson never recovered consciousness and died December 18, 1957.

Since His Honor the Trial Judge directed a verdict solely on the question of cause of death of Mrs. Gipson, on this appeal we shall assume that there was sufficient evidence to go to the jury on the question of the defendant's negligence and we will not treat that matter further.

The plaintiffs contend that even though the immediate cause of death of Mrs. Gipson was admittedly a malignant brain tumor, yet there was competent evidence from which the jury could reasonably have found that her death was hastened as a direct result of the electric shock which she received. They insist that under the authority of Railroad v. Northington, 1891, 91 Tenn. 56, 17 S. W. 880, and Elrod v. Town of Franklin, 1917, 140 Tenn. 228, 204 S. W. 298, the defendant is liable under our wrongful death statute if its negligence hastened the death of the deceased.

They quote and rely upon the following language from the Elrod case which quoted approvingly from the Northington case:

"In our own case of Railroad v. Northington, 91 Tenn. 56, 17 S. W. 880, the doctrine above stated was recognized. This was a death case, but the court approved a charge which said in substance that, if the deceased already had a fatal disease from which there was no hope of recovery, and his death was inevitable from that disease in a short time, and the injury was slight and of such a character as to aggravate the disease, and he died of the disease, and not of the injury, the plaintiff could not recover; but if death was hastened, or occurred sooner, by reason of the injury, than it otherwise would, then the injury was the cause of death. The court examined authorities pro and con and accepted the foregoing statement as embodying the true doctrine. In the course of the opinion the court made this statement:

" 'A man might be suffering from an incurable disease, or mortal wound, with only two days to live, when a negligent wrongdoer inflicted upon him an injury which in his condition of debility took his life or developed agencies which destroyed him in one day, and yet the latter wrong be in a legal sense the cause of his death, though it only hastened that which on the next day would have inevitably happened.' "

In support of the plaintiffs' contention they offered the following testimony of Mrs. Gipson's physician, Dr. Goldman:

"Q. What was your final diagnosis with reference to her condition from the original date you saw her until she died?

"A. My final diagnosis was post-electric shock syndrome, secondary anxiety state, acute cervical strain and neoplasm of the brain.

"Q You stated, I believe, that she had an acute cervical strain?

"A Yes.

"Q With a history of being shocked as you stated in the history, I don't understand the connection between that and the cervical strain; would you explain that for the benefit of the Court and jury?

"A Yes, the patient falling, in falling she may have jerked her head, and the fact that a shock goes through a person's body will cause the neck to jerk, and will cause a cervical strain.

"Q A jolt of some type; is that what you mean?

"A Yes.

"Q Will you state whether or not there was any acceleration or exaggeration or any connection whatever with the history of being shocked on the bus with her tumor condition you have described?

"A I cannot say the accident was the cause of the tumor but it was a thing that caused the process to speed up and lead to a very rapid death or demise.

"Q Would you say that it was more probable than not that the shock caused the process to speed up and cause her to die shortly thereafter?

"MR. LEWIS: I object to the question because it is leading.

"Q Will you state whether or not, or please tell us with what certainty you are making that statement?

"A Neoplasm of the brain is not that rapidly a growing tumor usually and this is particularly true in a woman of this age. Her symptoms came on so shortly thereafter; they were worse so shortly after the shock and I might add that on the first examination I made of her there was no evidence of this tumor or intercranial space occupying lesion at all, and a thorough physical examination was done, and yet in a period of only a few weeks the symptoms came on and ended in her rapid death or demise. So something must have happened that caused the tumor to grow so rapidly and get control of the body rather than the body holding the control over the tumor. This injury was certainly enough to lower the brain tissue and her body resistance and it simply allowed the tumor to become rampant in growth.

"Q State whether or not it is more probable than not that the accident, the shock accelerated or aggravated her condition and hastened her death?

"A Yes, I feel it did. It was my impression all along that that was the case."

Dr. C. D. Hawkes, the neurosurgeon who operated on Mrs. Gipson, testified that he first saw Mrs. Gipson on November 21, 1957, after she had been referred to him by Dr. Goldman. On his first examination she gave a history of the electric shock; she was somewhat hesitant in her speech; there appeared to be diminished sensation to

pain and touch involving the middle, third and fourth fingers and right hand and the right half of the palm and forearm; vibratory sense was apparently lost in the right palm also. Dr. Hawkes testified that it was difficult to explain the symptoms the patient was having on the basis of the history which she gave and he entertained the possibility that she had sustained a form of stroke or other disturbance in the brain. X-rays of the skull and cervical spine showed only normal findings.

He again saw her on November 27 and recommended an arteriogram or study of the circulation to the brain but the family was unwilling for the patient to submit to these additional tests at this time. She was discharged from the hospital on December 3.

On December 10 the patient's condition had worsened, she was re-admitted to St. Joseph Hospital and seen by Dr. Hawkes in consultation with Dr. Bland Cannon, another neurosurgeon of Memphis, Tennessee, at the request of the family. Dr. Cannon concurred in the recommendation of the arteriogram which was performed on December 12. The arteriogram showed a displacement of the arteries indicating some disease process which occupied spaces on the left side of the brain consistent with the disturbances on the right side of the patient's body. Dr. Hawkes and Dr. Cannon then recommended that an air injection be carried out and an operation performed.

On December 16, 1957, the air study was carried out which consisted of small openings being made in the skull, and air being forced into the brain. Subsequent X-ray pictures showed the existence of a mass in the left side of

the brain. From Dr. Hawkes' testimony we quote as follows:

A. "An operation was performed, and upon opening the skull, a tumor was found which extended deep into the brain and was of an infiltration type, that is not showing a clear demarkation between the limits of the tumor and the brain substance. This type tumor is known as a malignant glioma tumor, because it arises from some of the blood tissue of the brain.

"The mass was removed, but the patient did not respond satisfactorily and went downhill during the next 48 hours and died on December 18, 1957.

"The pathological examination of the tumor in the laboratory showed it to be a glioma, multiple form, which is one of the most malignant and rapidly growing of brain tumors.

"It was felt that this was the cause of her symptoms, and that she did not respond to surgical treatment because it had extended into the finer centers of the brain.

Q. "All right, Doctor Hawkes, I believe that you stated that the pathology report showed that it was a very malignant brain tumor. Would you tell us whether or not the other symptoms that you found when you first examined this woman and on subsequent examinations, in your opinion, were due to any relation to the accident, or were they consistent with and caused by the brain tumor?

"MR. CLEMONS: I wish to interpose an objection at this time on the basis that the doctor has not testi-

fied that the type of tumor, glioma, as he stated, was determined from his own observation or tests, and that he is testifying with regard to a report from a laboratory.

"MR. LEWIS: I will withdraw the question and re-frame it.

"Q Doctor, will you tell us whether or not the tumor was malignant?

"A Yes, the tumor was malignant.

"Q Now, then, could you tell us whether or not the symptoms which you found on your first and subsequent examinations, whether or not they were consistent with a brain tumor or with an accident of the type the lady complained of?

"A They were consistent with the brain tumor, and in my opinion were caused by it.

"Q Doctor, would you tell us whether or not an electric shock would cause a brain tumor?

"A No, sir, it would not.

"Q Doctor, could you tell us whether or not a shock of the type that the lady described would accelerate the growth of the brain tumor?

"A I know of no way in which it would do so.

"Q Then, doctor, one further question: Would you tell us whether or not the shock she received, in your opinion, in any way accelerated the lady's death?

"A In my opinion, it did not."

The official death certificate filled out by Dr. Hawkes described the cause of Mrs. Gipson's death as glioblastoma multiform.

Dr. Francis Murphy, another neurosurgeon of Memphis, Tennessee, was introduced as an expert witness for the defendant. The portion of Dr. Goldman's testimony quoted above was read to Dr. Murphy and he was asked if he agreed with Dr. Goldman's diagnosis. He answered as follows:

"A Before I can answer that, I would have to know what kind of tumor she had, what kind of brain tumor she had.

"Q Doctor, the official death certificate filled out by Doctor Hawkes shows she had a brain tumor, and it is described as a glioblastoma, multiform.

"A Well, in the first place, a glioblastoma multiform tumor is the most malignant of all brain tumors. It is always the most malignant, and it originates within the brain itself. Now, the cells of which it is formed represent the connective tissue framework of the brain, and the cause of this glioblastoma multiform tumor is completely unknown. As I have already stated, it is the most malignant of all brain tumors and it grows extremely rapidly, but in addition it produces symptoms in two other ways. It produces swelling of the brain around it, and produces thrombosis of the blood vessels that go through the other part or parts of the brain.

"Now, the average time from the onset of these symptoms of this glioblastoma multiform malignant tumor—the onset to death is less than a year, usually,

and I might add that to my knowledge this type of malignant tumor has never been cured, in medical history. It is unusual, to say the least, to have a patient live more than a year, and many die within three months from the onset of the symptoms. We have seen some patients die within a week from the onset of the symptoms.

"The fact, then, that this tumor produced symptoms within this time does not necessarily mean it was growing terribly rapidly, but it may well mean it was producing swelling of the brain or an interference with the blood supply, which could be equally damaging. In any event, in answer to your question, so far as I am aware, there is no known connection or effect between electric shock and the growth of a tumor of this sort, and therefore I do not agree with Doctor Goldman's statement."

It would prolong unduly this opinion to quote at length from the expert testimony of Dr. Murphy both on direct and cross examination. In substance he testified that the cause of the particular tumor of which Mrs. Gipson died was unknown; that there is no known cure; that generally this particular type of tumor is a very rapidly growing tumor but that it probably was in existence at the time Mrs. Gipson received the shock; that this particular type of tumor can and often does produce a great amount of swelling and interfere with the blood supply to the brain producing symptoms of an enlargement of the total mass without any change in the rate of growth.

With reference to the part a person's general physical condition plays in the development of a malignant tumor he testified as follows:

"Q Does a person's resistance have any bearing upon how long they will live with a malignant tumor?

"A We are still talking about tumors of the brain, are we not?

"Q Yes, doctor.

"A So far as it is known with certainty, no one really knows whether it does or not. We do know that some of these tumors grow rapidly and some do not, and we do not know why. The idea that the resistance of the body in the way I think you are talking about; namely, that the body builds up a certain amount of immunity, this is purely speculative, because we do not know. All I can tell you in regard to these tumors is that we do not know what causes them, we have no idea, and we have no idea whether the resistance of the body being good or not plays any part.

"Q So, doctor, I gather from your testimony, there is a great deal about cancers that medical science does not know yet?

"A That is absolutely correct.

"Q So, all we can hope is that the medical profession continues to learn about them, and some time a cure will be found?

"A We are hoping that, certainly, but we know there is plenty we do not know.

"Q And, doctor, that is particularly true with reference to this type of malignancy?

"A That is correct; at least so far as I am concerned, that is absolutely correct."

Further Dr. Murphy testified that while it is the general rule that mentally disturbed patients who are suspected of having a brain tumor are not given shock treatment, in his opinion the electric shock which Mrs. Gipson received while boarding defendant's electric streetcar had no relation to the increased growth of the brain tumor from which she was suffering and died.

The defendant cites and relies principally upon the case of Mayor and City Council of Nashville v. Reese, 1917, 138 Tenn. 471, 197 S.W. 492, L.R.A.1918B, 349. In our opinion none of the Tennessee cases cited and relied upon are directly in point.

Railroad v. Northington was a wrongful death case and a recovery was allowed but there was affirmative evidence that the direct and immediate cause of the plaintiff's death was the traumatic injury received by the deceased when he was thrown or shoved from a handcar.

The case of Elrod v. Town of Franklin, supra, quoted with approval from the opinion in the Northington case but it was not a wrongful death case.

In Mayor and City Council of Nashville v. Reese the deceased was injured when he fell out of a wagon on the streets of Nashville. He sustained a very severe injury to his kidneys and bladder, his general physical condition continued downward and he was stricken with pneumonia and died. The actual cause of death was found to be pneumonia caused by a germ as distinguished from pneumonia caused by trauma. A physician testified that the deceased Reese's general condition was weakened by the condition of his kidneys and he was made more susceptible to contracting the pneumonia germ than he would have been had he not been injured. Our Tennessee

Supreme Court speaking through Mr. Special Justice Malone denied a recovery. From his opinion we quote as follows:

"But, irrespective of this, we cannot assent to the proposition that, where a person has received an injury many months before, and afterwards dies of a germ disease, in no wise connected with such injury, a cause of action arises against the wrongdoer on the theory that by reason of such injuries the victim's constitution became weakened and thereby rendered him an easy prey to such disease. If such were the law, it might well have been contended in the case of Wagner v. Woolsey, supra [1 Heisk. 235], that the enforced exposure to the weather brought about by defendant's wrongful act weakened the constitution of the intestate so that he fell an easy victim to disease when subjected to the conditions of a war prison.

"The cause of action in these cases is purely statutory, and we think, as stated in the case of Wagner v. Woolsey, supra, that the damages to be recovered must be the natural and proximate consequence of the act complained of, and that this familiar rule seems to have been ignored in many cases of this character."

No discussion of the language from the Northington case was made in the Reese case. In our opinion the Reese case is more nearly applicable and controlling of the case at bar than either the case of Railroad v. Northington, supra, or Elrod v. Town of Franklin, supra. See also Stewart v. Crook Sanatorium, 17 Tenn. App. 589, 69 S.W.(2d) 259.

T.C.A. Section 20-607 provides as follows:

"20-607. Injury resulting in death—Succession to cause of action.—The right of action which a person, who dies from injuries received from another, or whose death is caused by the wrongful act, omission, or killing by another, would have had against the wrongdoer, in case death had not ensued, shall not abate or be extinguished by his death, but shall pass to his widow, and, in case there is no widow, to his children or to his next of kin; or to his personal representative, for the benefit of his widow or next of kin; where his or her natural parents or parent or next of kin are unknown, then to his or her legally adoptive parent or parents, or to the administrator for the use and benefit of the said adoptive parents or parent; the funds recovered in either case to be free from the claims of creditors. In the case of the death of a married woman, such right of action shall pass to the surviving husband. [Code 1858, sec. 2291 (deriv. Acts 1849-1850, ch. 58, sec. 1; 1851-1852, ch. 17); Acts 1871, ch. 78 sec. 1; Shan., sec. 4025; Code 1932, sec. 8236; Acts 1945, ch. 58, sec. 1; mod. C.Supp.1950, sec. 8236; Acts 1953, ch. 210, sec. 1.]"

■ Admittedly the immediate cause of Mrs. Gipson's death was the malignant tumor. In our opinion there was no competent evidence from which the jury could reasonably find that the electric shock received by Mrs. Gipson was a direct and proximate cause of her death.

It is true that Dr. Goldman testified in substance that in his opinion the electric shock damaged the brain of Mrs. Gipson or lowered her resistance or did something to make the cancer grow faster and that in effect the

electric shock hastened her death. However, Dr. Goldman is a specialist in the field of internal medicine and cardiology and does not claim to be an expert either in the field of cancer or in the field of neurosurgery. He testified to no particular experience with brain tumors nor did he give any facts or foundation on which he based his theory that the electric shock in some manner aggravated or accelerated the growth of the cancer.

On the other hand, Dr. Murphy, testifying as an expert in the field of neurosurgery, testified affirmatively that the cause of the particular tumor with which Mrs. Gipson was suffering is unknown; that there is no known cure and that medical science does not now know what makes them grow fast or slow and does not know what relation, if any, the physical condition of the patient bears upon the origin or growth of this type of brain tumor; and that all theories that lowered resistance makes the tumor grow faster are mere speculation.

Dr. Goldman was not called to rebut or refute any of the testimony given by Dr. Murphy. A rereading of Dr. Goldman's testimony impresses us that his opinion that the electric shock accelerated the growth of the cancer is in reality just a theory. In substance it is that his patient, Mrs. Gipson, was apparently in good health; she sustained a shock; shortly thereafter symptoms of the tumor began to appear, therefore the electric shock must have caused the tumor to grow more rapidly. As the logicians say, post hoc (after this) does not necessarily mean propter hoc (on account of this). In our opinion it would have been speculation and conjecture on the part of the jury to have found that the electric shock was a direct and proximate cause of Mrs. Gipson's death.

Hence, assignments of error I, II and III are respectfully overruled.

Mrs. Gipson filed an original suit for personal injuries against the defendant on November 4, 1957. After her death on December 18, 1957, an order was entered on March 14, 1958, suggesting the death of Mrs. Gipson and reviving the cause of action in the name of her next of kin, the present plaintiffs. They in turn amended the original declaration so as to allege the death of Mrs. Gipson and to increase the ad damnum from $15,000 to $100,000.

In dismissing the present cause His Honor the Trial Judge ruled that the plaintiffs were not entitled to recover for the personal injuries sustained by Mrs. Gipson including pain and suffering prior to her death for the reason that the suit had not been revived in the name of the personal representative. Assignment of error No. IV assails this action of His Honor the Trial Judge.

■ Where an injured party brings suit for personal injuries and thereafter dies from other supervening causes such suit for personal injuries may be revived in the name of the plaintiff's personal representative but not in the name of the next of kin. T.C.A. Sections 20-602, 20-618; Memphis Street Railway Co. v. Prince, 1912, 2 Tenn.Civ.App. (2 Higgins) 688; Burnett v. Layman, 1914, 130 Tenn. 423, 171 S.W. 76; Burnett v. Layman, 1915, 133 Tenn. 323, 181 S.W. 157; Stewart v. Crook Sanatorium, 1933, 17 Tenn.App. 589, 69 S.W.(2d) 259.

■ Since the Trial Court correctly held as a matter of law that there was no evidence that defendant's tort was the cause of Mrs. Gipson's death, he correctly held that the claim for pain and suffering sustained by Mrs.

Gipson in her lifetime as a result of said tort was not properly revived in the name of the present plaintiffs as next of kin after her death.

All of the assignments of error are overruled and the judgment of the lower court is affirmed at the costs of the plaintiffs-in-error.

Avery, (P. J. W. S.), and Bejach, J., concur.